IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
On-Briefs February 6, 2003

IN THE MATTER OF:  R.L.H., A Child under Eighteen (18) Years of Age,
STATE OF TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES v.
DARLENE MEDLEY HALL

A Direct Appeal from the Juvenile Court for Franklin County
No. J00721     The Honorable Floyd D. Davis, Judge

No. M2002-01179-COA-R3-JV - Filed June 3, 2003

Department of Children's Services filed petition to terminate parental rights of mother of abused, dependent and neglected minor child.  Department's termination petition was based on allegations of abandonment, mother's failure to substantially comply with a permanency plan, the removal of the child for at least six months with little likelihood that the conditions causing removal would be remedied, and the best interests of the child.  Juvenile Court granted petition terminating mother's parental rights.  Mother appeals.  For the following reasons, we affirm.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed and
Remanded

ALAN E. HIGHERS, J., delivered the opinion of the court, in which DAVID R. FARMER, J., joined, and W. FRANK CRAWFORD, P.J., W.S., dissents with separate opinion.

John R. Colvin, Winchester, For Appellant, Darlene Medley Hall

Paul G. Summers, Attorney General and Reporter, Douglas Earl Dimond, Assistant Attorney General, For Appellee, State of Tennessee Department of Children's Services

OPINION

Facts and Procedural History

This is a termination of parental rights case.  The petition was filed to terminate parental rights to two children, J.W.M. and R.L.H., and was filed against both the mother, Darlene Medley Hall ("Hall"), and the natural father, Donald Ray Hall ("father").  The juvenile court initially terminated father's parental rights to both children and Hall's parental rights to J.W.M., and there is no appeal from this ruling, and it is not included in this appeal.  Therefore, our review of the pleadings and the proof will be in reference to R.L.H. as the sole subject of the trial court proceeding.

R.L.H. (d/o/b 10/2/91) was originally removed from Hall's care and placed in the custody of the Tennessee Department of Children's Services ("DCS") in January 1998, upon allegations that Hall's live-in boyfriend sexually abused R.L.H. In November 1998, R.L.H. was placed in the custody of father but was again removed to DCS's custody in September 1999 based on allegations that father physically abused minor child.[1] R.L.H. was placed in a therapeutic foster home and at the time of trial was still in the home. He has a learning disability and a language problem and receives special education services. He has post-traumatic stress disorder and is receiving therapeutic treatment for that disorder.

Hall is in her mid-thirties and the mother of three children. None of these children are currently in her custody. Hall was diagnosed as mentally retarded at a young age, and as such, has received Social Security Disability since childhood. Hall's monthly income consists of approximately $505.00 in disability payments and $11.00 in food stamps. Hall is unemployed, and has not had a job in several years.

DCS drafted a Permanency Plan on October 15, 1999. The goal of this original plan was to "return" R.L.H. to Hall's custody. As part of this plan, DCS listed several "barriers to permanency," including Hall's failure to report physical abuse by father despite knowledge of the bruises, and her continued cohabitation and/or association with a known or suspected child abuser. To guide Hall in overcoming these barriers, DCS also included a list of specific services to be provided, and actions to be taken to facilitate return of the child. Specifically, DCS required Hall and R.L.H. to undergo individual counseling to address abuse and behavior issues, and further mandated that Hall attend parenting classes, participate with her case manager or another professional to develop a list of age appropriate behavior rules for the minor child, learn techniques to enforce these behavior rules, admit guilt or responsibility for her role in allowing past abuse to persist, and draft a letter to R.L.H. accepting responsibility for her failure to protect the minor child from said abuse. Successful completion of the counseling and treatment requirements was slated for April 2000. Hall signed the plan on October 22, 1999.

On December 5, 2000, DCS filed a petition to terminate Hall's parental rights and those of the father as to minor children R.L.H. and J.W.M.[2] DCS based its petition to terminate mother and father's parental rights as to the minor children on the following grounds: (1) abandonment pursuant to Tennessee Code Annotated section 36-1-113(g)(1); (2) substantial noncompliance with an established permanency plan as required in Tennessee Code Annotated section 36-1-113(g)(2); and (3) the presence of persistent conditions that led to the child's removal, "little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent," and proof that continuation of the parent-child relationship "greatly diminishes the child's chances of early integration into a safe, stable and permanent home," according to Tennessee Code Annotated

---

[1] These abuse allegations were based on two separate reports that bruises were discovered on R.L.H.'s body, the first report noting that bruises were seen on minor child's hips, legs, and buttocks, and the second asserting that bruises were found on and around the child's head.

[2] Hall's oldest son, minor child J.W.M., was removed from her care in May 1991, as a dependent and neglected child. Legal custody of J.W.M. was granted to child's great aunt and uncle. In October 1998, J.W.M. was removed from this home and returned to the custody of DCS upon allegations of physical abuse at the hands of aunt and uncle. J.W.M. remains in foster care to this date. Hall is not appealing the termination of her parental rights as to J.W.M.

section 36-1-113(g)(3)(A). The petition also alleges that termination is in the best interest of the child.

A hearing was held on January 18, 2001 to review whether DCS should remain in temporary custody of R.L.H. and J.W.M. By Order entered March 5, 2001, the court determined that the minor children should remain in the temporary custody of DCS, and appointed counsel to represent Hall in the upcoming termination proceeding. The court further noted father's failure to appear at the January 18 hearing.

On January 23, 2001, DCS drafted a revised permanency plan which Hall ultimately refused to sign. Pursuant to this plan, the permanency goal was changed from "return to parent" to adoption. DCS asserted several new barriers to permanency, including Hall's failure to comply with, or work toward the completion of, the goals set forth in the original permanency plan and her continued cohabitation with a man who had been indicated by DCS for sexually abusing R.L.H.

As scheduled, a hearing on DCS's termination petition was held before the juvenile court on March 7, 2001. During this hearing, Hall testified that she was currently living with a friend in Belvidere, Tennessee, as she had been evicted from her apartment in February 2001 for failure to pay rent.[3] Hall informed the court that she had ceased living with the indicated sex abuser approximately two months prior to the March 7th hearing.

When questioned about her failure to comply with the requirements set forth in both the original and revised permanency plans, Hall admitted that she had not attended any of the mandated counseling sessions,[4] had not yet attended the requisite number of parenting classes,[5] and acknowledged that she had not written a letter to R.L.H. accepting responsibility for her failure to protect him from continued physical and sexual abuse.

---

[3] Hall testified that she was unable to make her rental payments because she was financially supporting her live-in boyfriend. Appellant noted that she borrowed money from a finance company to help her boyfriend pay fines, and also owed a debt to a second finance company on money or credit secured for the purchase of a television, air conditioner, and washing machine.

[4] Hall explained that she has not attended any counseling sessions because she did not have transportation.

[5] Hall first testified that she had attended a parenting class in Decherd, Tennessee. Upon further questioning, appellant noted:

> Q: Okay. So have you done anything as far as on your plan that you recall doing? I mean, have you done anything?
>
> A: I'm supposed to be going at the first – second Tuesday in April to the parenting classes.
>
> Q: Okay. So you haven't started that?
>
> A: Not yet.

The record in this case includes a report from attorney Glen A. Isbell ("Isbell"), the appointed Guardian ad Litem for minor children R.L.H. and J.W.M.[6] In his report, Isbell confirms that Hall was evicted from her apartment and is currently living with friends in Belvidere, Tennessee, until she can find a place of her own. Isbell also reports that Hall was living with her boyfriend, the indicated sex abuser, until just prior to March 6, 2001.

Addressing the issue of Hall's noncompliance with the original or revised permanency plans, Isbell notes that appellant had not completed any task listed in the revised permanency plan that she signed on April 10, 2000.[7] Isbell also reported that Hall had not attended any counseling sessions or parenting classes as of March 6, 2001, but noted that Hall blamed her failure to fulfill these obligations on the fact "that she did not know what she was supposed to do, or the department never set the classes up, however she would like to start taking the parenting classes in April in Townsend." Isbell further reiterated that Hall maintained regular visitation with R.L.H., but not with J.W.M.

Isbell's report also addressed allegations of physical abuse by father, and the effects that this abuse, and Hall's failure to prevent it, had on R.L.H.'s behavior. Isbell noted:

> In reviewing the file as to [**R.L.H.**], there are reports that the father **DONALD RAY HALL**, physically abused [R.L.H.]. It is my understanding that the abuse was inflicted by the father and was known by the mother, however she did not report this abuse or take the necessary steps to protect her child. [R.L.H.] has some of the same problems by acting out and behavioral problems as [J.W.M.] currently maintains. He will continue to need the necessary counseling and treatment in the future.

At the conclusion of his report, Isbell offered the following recommendation:

> There is concern as to whether the mother, **DARLENE MEDLEY HALL**, is capable of meeting the needs of these children and protecting her children from themselves and the public. She has recently been evicted from her apartment and is currently living with a friend. The mother needs to get her life in order, before she should be allowed to have these children back in her home. I think she has problems herself, which she needs to address such as, stable environment for the children, counseling, undesirable companions that these children may be exposed to, and whether these children are more important than these undesirable companions. Without the availability of a psychological report on the mother, there is concern

---

[6] Isbell noted that he had not spoken to either of the minor children prior to submitting this report. The Guardian ad Litem's report was based on his conversations with Hall and the DCS caseworker assigned to minor children's case, and a review of all relevant files and exhibits.

[7] According to this report, the juvenile court approved the April 2000 permanency plan on April 19, 2000.

that the mother is borderline mentally challenged. I believe that she does not understand or realize the seriousness or consequences that are presently before her. There is concern as to whether she is mentally capable of completing the necessary steps in getting her children returned. She has two (2) children that will require counseling and treatment for years to come. I believe the mother loves these children and she wants the children back in her home, however, the time is now in determining what and/or who is more important. This Court should take a look at whether this mother will be mentally and physically capable of raising these children, which I am unable to do at this time.

From the evidence presented at this March 7th hearing, the juvenile court found clear and convincing evidence for grounds for termination of Hall's parental rights to the older child, J.W.M., but did not make a finding as to R.L.H., instead continuing the case to a later date pending completion of a psychiatric evaluation of Hall's competency to parent R.L.H. On May 1, 2001, the juvenile court filed an order in two parts: the first part is styled "Default Judgment,"[8] and the second part is styled "Termination Of Parental Rights And Final Decree Of Guardianship As To [J.M.] And Partial Guardianship As To [R.H.]." The second part terminated the parental rights of both respondents, Darlene Hall and Donald Ray Hall, as to J.W.M. and terminated the parental rights of Donald Ray Hall to R.L.H. There has been no appeal from this ruling.

On May 31, 2001, J. Trevor Milliron, Ph.D. ("Dr. Milliron"), performed a psychological evaluation of Hall upon referral by DCS. According to Dr. Milliron's report, "[t]he purpose of this evaluation was to assess this individual's level of intellectual functioning and emotional stability. This evaluation also obtained information about how her personality dynamics impact her parenting abilities."

In his evaluation, Dr. Milliron reported that Hall could barely read, was poorly groomed, experienced difficulty concentrating, and "struggled with many simple questions, including her own

---

[8] The order states:

In this cause, on Motion of the Petitioner, and it appearing to the Court that service of process by publication has been duly made upon the Defendant, Donald Ray Hall, that said Defendant has failed to appear and make defense to said petition within the time required by law, IT IS ORDERED that said petition be taken as confessed to by said Defendant Donald Ray Hall and the cause set for hearing ex parte.

We note that on the face of the petition to terminate parental rights Donald Ray Hall's address in Winchester, Tennessee is shown. We also note that the record includes a copy of the permanency plan filed in the case which lists Donald Ray Hall's address in Winchester, Tennessee, along with his telephone number. Although there may be other parts of the record pertaining to the matter against Donald Ray Hall that are not included in the record before us that might substantiate service of process by publication, there is nothing in the record before us to indicate such a situation. We also note that there is nothing in the record to indicate that proper notice of the motion for judgment by default, if there was ever a motion, was served on Donald Ray Hall pursuant to the provisions of Tenn.R.Civ.P. 55.01. On remand, the status of the case against Donald Ray Hall should be reviewed.

-5-

name." Dr. Milliron noted that, at the time of this evaluation, Hall was living with her new boyfriend. With regard to Hall's compliance with the permanency plan requirements, Dr. Milliron recounted that appellant informed him that she had attended six parenting classes, maintained regular visitation with R.L.H., and had participated in one counseling session, after which the counselor reportedly informed her that further sessions were unnecessary.

Dr. Milliron utilized a series of aptitude and intellectual functioning tests to evaluate Hall, and, based on Hall's performance on these tests, Dr. Milliron concluded that she appears to be experiencing "some mild reactive depression and anxiety symptoms directly related to loss of custody of her children. She also appears to meet both the functional and intellectual criteria for mild mental retardation." Dr. Milliron closed his evaluation with the following summary and recommendations:

> Ms. Hall expressed strong positive emotion toward [R.L.H.] during the interview. She did admit that [R.L.H.] was a challenging child for her to parent due to his quick temper. She stated she believed she had learned effective techniques during her parenting classes and was eager to try these techniques on [R.L.H.]. Ms. Hall's ability to function is substantially limited, primarily by her mental retardation. Parenting a challenging child would be difficult for Ms. Hall under the best of circumstances, but is particularly problematic with the lack of substantial family and community support. She has been ineffective in protecting [R.L.H.] from harm in the past and would be unlikely to be able to do so in the future due to her cognitive limitations without this kind of substantial support. In her favor, she does appear to be motivated to do what is necessary to regain custody, although she has been unable to find an alternative living situation. Any placement of [R.L.H.] back into his mother's care should be accompanied by both professional (continued counseling for [R.L.H.] and parenting classes for Ms. Hall) and family commitments of ongoing support.

Upon the juvenile court's request, Dr. Milliron submitted an addendum to his evaluation on August 3, 2001, stating his opinion as to whether Hall could be trained to provide minimal care for R.L.H. Dr. Milliron cited several damaging factors:

> 1. - Severe cognitive limitations as evidenced by history and IQ scores
> 2. - Lack of adequate family and community support
> 3. - Unstable living arrangements
> 4. - History of interpersonal difficulties and volatile relationships
> 5. - Inability to read, drive or find suitable employment
> 6. - A clear pattern of multiple failures to provide minimal protection of any of her three children over a period of several years
> 7. - Poor insight based on her IQ scores, Family Apperception Test, and Interview

8. - Evidence, based on her self-report, that her son, [R.L.H.], would be a challenging child to raise by any parent due to frequent behavioral problems

9. - Substantial depression and anxiety symptoms

10. - Inability to properly stay on medication for anxiety as prescribed by physician

Considering these factors in their totality, Dr. Milliron offered the following opinion:

> No one of the above mentioned problems, including her cognitive limitations, would preclude her ability to be trained to provide minimal care of her child. However, when considered together, Ms. Hall simply has many circumstances working against her at once. It is my considered opinion that at this current time and the immediate foreseeable future, Ms. Darlene Hall is highly unlikely to be able to be adequately trained to provide minimal standards of care for her child.

On September 26, 2001, a supplemental hearing was held before the juvenile court to consider Dr. Milliron's psychological evaluation and addendum. In this hearing, Ms. Hall stated to the court that she understood she was a slow learner but she was going to school at Townsend School, taking reading, writing, and math, and that she had been rather steadfast in her support of R.L.H. The following exchange took place at this hearing:

> MS. HALL: I have been standing behind him since he's been in DCS custody and stuff, been trying to get him through it and stuff.
>
> THE COURT: Of course, my problem is I hate to terminate parental rights when a parent is trying if there's any chance.
>
> MS. HALL: I'm doing my best.
>
> THE COURT: I think I told you that the last time you were here. And based on what these reports are saying there will at least be very, very, very little option of what to do. I don't know why they came to these conclusions. I read what they say and they're not very good.
>
> MS. HALL: I'm a slow learner and I'm going to school up here at Townsend School for my reading and writing and math and stuff. I was in special ed classes all the way through school.
>
> THE COURT: And the worst part about the decision I may have to make is once it's made it's almost irreversible. I mean, I know of very little things that would reverse it because all kinds of things start

happening so far as this child is concerned.  But on the other hand, based on these reports I can't in good conscience say that there's any chance that you would ever get this child back.  I mean, I honestly wish there was – I was hoping that this doctor when I sent you back – because you've tried – would give us some hope.  But it doesn't look very favorable.  I'm sure Mr. Colvin has gone over with you what Dr. Milliron is saying.

On April 11, 2002, the court entered its final decree terminating Ms. Hall's parental rights to R.L.H.   The final decree states in pertinent part:

And thereupon, this cause came on to be further and finally heard on the 26th day of September 2001, before the Honorable Floyd Davis, Judge of the Juvenile Court of Franklin County, Tennessee. Respondent Donald Ray Hall's parental rights were terminated on February 22, 2001.  Having reviewed the psychological reports as requested and based upon previous testimony, statements of counsel upon the sworn petition of the State of Tennessee, Department of Children's Services, proof introduced at the hearing and the entire record, from all of which the ***Court finds by clear and convincing evidence that it is in the best interest of the said child*** and the public that all of the parental rights of the Respondent to the said child be forever terminated and that the complete custody, control and guardianship of the said child should now be awarded to the State of Tennessee, Department of Children's Services with the right to place said child for adoption and to consent to any adoption in loco parentis. This decree will have the effect of terminating all the rights, responsibilities, and obligations of the Respondent to the said child and of the said child to the Respondent arising from the parental relationship, and the Respondent is not hereinafter entitled to notice of proceedings for the adoption of said child by another nor have any right to object to such adoption or otherwise to participate in such proceedings, or hereafter, at anytime, to have any relationship, legal or otherwise, with said child.

(emphasis added).

## Issue

Hall filed a Notice of Appeal, and presents for review the sole issue of whether there is  clear and convincing evidence of grounds for termination of her parental rights and that termination is in the child's best interest.

## Standard of Review

Pursuant to Tennessee Code Annotated section 36-1-113(c)(1)(2) (2001), termination of parental rights must be based on a finding by clear and convincing evidence that grounds for termination exist, and that such termination is in the best interest of the child. Since this case was tried by the trial court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. T.R.A.P. 13(d). "Where the trial judge has seen and heard the witnesses, especially if issues of credibility and weight to be given oral testimony are involved, considerable deference must be accorded those circumstances on review." *McCaleb v. Saturn*, 910 S.W.2d 412, 415 (Tenn. 1995) (citing *Townsend v. State*, 826 S.W.2d 434, 437 (Tenn. 1992)).

## Law and Analysis

It is a well established premise that "[a] parent has a fundamental right to the care, custody and control of his or her child." *Dep't. of Children's Servs. v. Wiley*, No. 03A01-9903-JV00091, 1999 WL 1068726, at *3 (Tenn. Ct. App. Nov. 24, 1999) (citing *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). A parent's right to the care, custody, and control of his or her child is not absolute and may be terminated if justified by clear and convincing evidence under the applicable statute. *See In re C.W.W., N.W.W., Z.W.W., & A.L.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000) (citing *Wiley*, 1999 WL 1068726, at *3 (citing *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982))). As stated, termination of parental rights must be based on a finding, by clear and convincing evidence, that the grounds for termination of rights have been established and that termination of parental rights is in the best interest of the child. T.C.A. § 36-1-113(c)(1) and (2). Clear and convincing evidence has been defined as evidence which "'eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence.'" *In the Matter of: C.D.B., S.S.B., & S.E.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2000) (citing *O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. Ap. 1995)). In addition, in order to terminate parental rights there must be a showing that the parent is unfit or that substantial harm to the child will result if the parental rights are not terminated. *In Re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999) (citations omitted).

Tennessee Code Annotated section 36-1-113(g) (2001) sets forth the legal grounds upon which termination of an individual's parental rights may be based. "[T]he existence of any one of the statutory bases will support a termination of parental rights." *In re C.W.W., N.W.W., Z.W.W., & A.L.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000) (citations omitted).

In its petition to the juvenile court, DCS listed several grounds for termination and further asserted that termination is in the best interest of the child under Tennessee Code Annotated section 36-1-113(g)(7)(A)(ii) (1996). At the time this petition was filed, Tennessee Code Annotated section 36-1-113(g)(7) permitted termination where the parent is incompetent to adequately provide for the care and supervision of a child because of an impaired mental condition and, pursuant to subdivision (ii), cited in DCS's petition, termination is in the best interests of the child.[9]

---

[9] Termination based on mental incompetence of the parent is currently governed by T.C.A. § 36-1-113(g)(8) (2001).

Although DCS did not specifically refer to mental impairment or incompetence as grounds for termination in its petition, it appears that its citation to Tennessee Code Annotated section 36-1-113(g)(7) was sufficient to alert Hall to these grounds. Our conclusion is supported by the fact that counsel for both parties addressed the competency issue in opening statements at the March 7, 2001 hearing. We note also that the court reserved judgment on the termination issue at the March 7th hearing pending a psychological evaluation of Hall. Additionally, we note that Hall failed to raise an objection to the incompetency issue/grounds at either the March 7 or September 26 proceedings.

Tennessee Code Annotated section 36-1-113(g)(7) (1996) provides:

> (A) The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate the parent's or guardian's rights to the child.
>
> (B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:
>
> (i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future, and
>
> (ii) That termination of parental or guardian rights is in the best interest of the child.
>
> (C) In the circumstances described under subdivisions (g)(7)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated.

From his comments at the September 26, 2001 proceeding, it seems that the juvenile court judge based his decision to terminate Hall's parental rights on the grounds of mental incompetence on the evaluation and addendum opinion of Dr. Milliron. In forming his opinion, Dr. Milliron relied upon the results and information gleaned from the tests and interviews conducted on May 31, 2001. Dr. Milliron specifically considered several factors in reaching his final opinion that Hall was unfit to care for her child, including her below average IQ scores, severe cognitive limitations, unstable living conditions, lack of adequate support from outside sources, inability to read or drive, "failure to provide minimal protection of any of her three children over a period of several years, and history

of relationships with known or suspected abusers."  Based on all of these factors, Dr. Milliron articulated the following opinion as to Hall's ability to provide adequate care to R.L.H.:

> No one of the above mentioned problems, including her cognitive limitations, would preclude her ability to be trained to provide minimal care of her child.  However, when considered together, Ms. Hall simply has many circumstances working against her at once.  It is my considered opinion that *at this current time and the immediate foreseeable future*, Ms. Darlene Hall is highly unlikely to be able to be adequately trained to provide minimal standards of care for her child.

(emphasis added).

We are particularly concerned with two of the factors cited by Dr. Milliron in support of his opinion.  First, we note that there is considerable evidence in the record to indicate that Hall knew of, or at least suspected, that R.L.H. was being physically and sexually abused, at the time the abuse was taking place.  Despite this knowledge, Hall failed to contact the proper authorities, or take any other reasonable measures to protect R.L.H. from further abuse.

Hall does not deny that she was aware of the physical abuse inflicted upon R.L.H. by his father, but she remains skeptical as to her son's sexual abuse claims.  The following testimony from the March 7 hearing is convincing evidence that Hall does not fully acknowledge or credit R.L.H.'s allegations of sexual abuse:

> Q: When [R.L.H.] first was taken into custody a couple of years ago for the sexual abuse, did you believe [R.L.H.] when he said that [your boyfriend] had done that to him?
>
> A: No, I didn't.
>
> Q: And do you believe that now?
>
> A: In a way I do.
>
> Q: But in a way you don't?
>
> A: Right.
>
> Q: What about when [R.L.H.] said that his father beat them?
>
> A: I believed him.  I saw pictures where he had bruises on his legs.

We have concern regarding Hall's mental and emotional capacity to properly care for R.L.H., concern supported by the fact that none of appellant's three children are currently in her custody. At least two of Hall's children, R.L.H. and J.W.M., were removed from her custody as dependent and neglected children.  Moreover, Hall's parental rights as to J.W.M. were terminated without an

appeal. This documented history of neglect is evidence that Hall was incapable of providing adequate care to R.L.H. at the time of trial.

Hall introduced evidence to refute Dr. Milliron's opinion that appellant could not be adequately trained to provide even minimal care to R.L.H., by a brief letter from Sandra Langley ("Langley") of Highland Rim Mental Health Center. In this letter, Langley concludes that Hall does not meet the criteria for diagnosis of mental illness, and further notes that "her inability to parent her son, is not a problem of mental health, but her inability to enforce boundaries and limits." There is no indication in the record as to Langley's professional qualifications, and no evidence to determine how many times Langley counseled/interviewed Hall, the basis for Langley's opinion, or the measures or tests utilized to evaluate appellant.

The trial court, in its comments on September 26, 2001, found that all ten reasons that Dr. Milliron listed were horrible, but "the most damaging part, it is the last line, which says, it is my considered opinion that at this current time and the immediate foreseeable future Ms. Darlene Hall is highly unlikely to be able to be adequately trained, to provide minimal standards of care for her child." The trial judge also noted that the immediate foreseeable future might last forever. We agree. The record clearly indicates that Hall has many factors which hinder her ability to provide minimal levels of care and protection to her special needs son. Unfortunately, due to Hall's limited intelligence, it is very unlikely that her cognitive limitations will ever improve to the level required to properly care for R.L.H. As such, we find the trial court committed no error.

We also find that there is clear and convincing evidence in the record to demonstrate that there has been substantial noncompliance by Hall with respect to the permanency plan under Tennessee Code Annotated section 36-1-113(g)(2). The permanency plan required Hall to attend counseling, attend and participate in parenting classes, write a letter to R.L.H. accepting her failure to protect him from abuse, and to develop a list of age-appropriate behavior rules. At the March 7, 2001 hearing, Marcia Ray, the team leader at the Department of Children's Services, testified that Hall did not attend the required counseling and that, to her knowledge, Hall had not taken the required parenting classes. In his report, filed March 7, 2001, Isbell, the guardian ad litem, stated that Hall "has not completed any of the tasks that the Department of Children Services has outlined in the Permanency Plan." Isbell went onto note that Hall stated that she had not been to counseling or any parenting classes. Hall herself testified at the March 7, 2001 hearing that she had not done any counseling and that she had yet to begin her parenting classes. In his evaluation conducted May 31, 2001, Dr. Milliron noted that Hall reported that she had attended one counseling session and six parenting classes. Despite her efforts after the termination petition had been filed and a hearing conducted, Hall did not take any action to comply with the Permanency Plan, other than visitation, from October 15, 1999[10] until sometime between March 7, 2001 and May 31, 2001. Also, Hall never wrote the required letter to R.L.H. accepting her failure to protect him from abuse. In addition, Hall testified that she did not believe R.L.H. when he told her that her then-boyfriend had abused him. Hall testified that, to this day, she does not completely believe R.L.H. One of the primary reasons R.L.H. was taken away from Hall's care was that he suffered abuse and she failed to take any action to protect him or prevent further abuse. We find that Hall's refusal to accept responsibility for her role in failing to protect R.L.H., coupled with the fact that Hall waited well over one year to begin

---

[10] October 15, 1999 is the date listed on the initial plan.

any type of required parenting classes, sufficient to find that Hall was in substantial noncompliance with the permanency plan.

After a finding that the grounds for termination have been established by clear and convincing evidence, the court must then determine if termination is in the best interests of the child. T.C.A. § 36-1-113(c)(2). Section 36-1-113(i) enumerates the following factors courts are to consider in making the best interests determination:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

T.C.A. § 36-1-113(i)(2002). After reviewing the aforementioned factors, we agree with the trial court that termination of Hall's parental rights is in the best interests of R.L.H. R.L.H. is a special

needs child who has specific learning, speech, and behavioral problems.[11] Hall has consistently failed to provide the stable environment which R.L.H. desperately needs. Hall's sole support is derived from social security, she has no prospects for employment in the near future, she has failed to provide a safe and suitable home for R.L.H. in the face of abuse, and Hall had no suitable residence for the child at the time of trial. In her favor, it is clear from the record that Hall made regular visitations with R.L.H., and the record indicates that R.L.H. is anxious to continue such visitation. Further, the representative of DCS testified that there was bonding between Hall and the child. However, as this Court has previously held, "the development of a 'relationship,' without more, is an insufficient basis to support a finding that it is not in the best interest of [the minor child] to terminate his parents' parental rights." *State of Tennessee Dept. of Children's Services v. D.G.B. and C.B.*, No. E2001-02426-COA-R3-JV, 2002 Tenn. App. LEXIS 647, *27 (Tenn. Ct. App. Sept. 10, 2002).

In consideration of all the relevant factors, removing R.L.H. from Hall's care and custody offers R.L.H. his best chance at a healthy and productive life. *See In the Matter of C.D.B., S.S.B., & S.E.B.*, 37 S.W.3d 925, 928 (Tenn. Ct. App. 2000). All reports indicate that R.L.H. is in need of continued counseling and therapy and has been placed in a therapeutic foster home where he currently resides under the care of trained foster parents. He is enrolled in school, and although he still engages in inappropriate conduct on occasion (lying, stealing, disruptive behavior), he has "made improvements in the areas of stealing and lying in the past few months" and has shown "some progress" with regard to his behavior in school. Despite all he has been through, R.L.H. seems to be adapting well. R.L.H. is approximately twelve years old at the present time and the "continuation of the parent . . . and child relationship greatly diminishes [his] chances of early integration into a safe, stable and permanent home." *See* T.C.A. § 36-1-113(g)(3)(A)(iii).

Under the record before us, we find that the evidence preponderates in favor of the trial court's finding of clear and convincing evidence that termination is in the best interest of the child. Accordingly, the order of the trial court terminating Hall's parental rights to R.L.H. is affirmed. The case is remanded to the juvenile court for such further proceedings as may be necessary with respect to our comments concerning the default judgment. Costs of the appeal are assessed against the Appellant, Darlene Medley Hall.

_____
ALAN E. HIGHERS, J.

---

[11] According to the October 15, 1999 permanency plan, R.L.H. was diagnosed with Attention Deficit Hyperactivity Disorder, and reportedly functioned below grade level.